But we will call the case Henry Grand Jury Investigation, Mr. Lowell. Good afternoon, Your Honors, and may it please the Court, with your permission, I'd like to reserve four minutes for rebuttal. That request will be granted. Thank you, sir. I am, as you indicated, Abby Lowell, along with Mr. Ryan and Mr. Tynan, who represent the appellants in this case. Your Honors, we filed this appeal primarily because we had to preserve the issue because of the breadth, as we saw it, of the District Court's opinion. And yet, at the same time that we had to do this, we feel like, in part, the case is not really ready for your review. For example, there were three witnesses about which there was a dispute, and for all intents and purposes, it's now down to questions about one of them, Mr. Michael Bernard. Well, when you say, for all intents and purposes, have you guys conferred? Is that, in fact, the case that we're not talking about Talbot anymore? Because I was really wondering why we're talking about Talbot. I don't understand that at all. With you on that, I think I could say it this way. I don't think that we have a problem in answering any of the questions the Court ordered as to Mr. Kelly and as to Ms. Talbot. She was prepared to answer all the questions posed. We, remember, had an interview with her. She was asked however many dozens of questions. She will answer each and every one of those questions at the grand jury. If there's a dispute, it might be about the question asked as to whether the office of Senator Menendez or Senator Menendez himself is asserting a speech and debate use privilege over a particular document. That's not a question she could answer, no matter how many times it was put to her. So, consequently, I don't think there's a dispute about her. Senators will have no objections as to either any of the questions that were posed in the FBI 302, in her interview, or in her testimony in August. Correct. I think the record should be clear about that. Okay. You said that there could then be a dispute made by the Senator himself. Doesn't that still mean that the question's hanging out there as to whether there's some things that may be asked of Ms. Talbot? Or the way they're asked could touch on the speech and debate clause? When you say touch upon, of course it could. But let's make sure that we understand that it is, for me, a very complicated issue. The speech and debate clause is talked about as a privilege. It's not really a privilege. It's an immunity. And so, consequently, it has a testimonial aspect, but it also has a use aspect. So, if the Justice Department desires – But we're here essentially at this phase in the – That's right, privilege. Exactly right. And in that case, I can say to your honors that Ms. Talbot would answer all the questions that were reflected, Judge Krause, in the FBI 302. And maybe they would add some connective tissue in between the questions. I can't imagine she would not. So, it gets back to the fact that even as to Mr. Bernard, one of the things that we could have done was to further – and we were trying to narrow the areas of dispute. The problem with that was is that the lower court issued its order giving us access to the grand jury transcripts in which we then could see the questions simultaneously with ordering all the questions to be answered. So, we didn't have the opportunity to do that there either. Is it a fair reading of her issuing those things simultaneously that she's not suggesting answer, quote, all, unquote, the questions, but answer the things that are in these transcript portions that I'm letting you see? In other words, can her order be read as an effort to limit the questioning in some degree and not as broadly as you've couched it in your brief in front of us? I don't think so, Judge Jordan. And the reason I'm saying that is because she was given an appendix or she's been given the transcript of questions and has ordered all the questions – and his role is advising and consenting on a nomination of Administrator Tavenner in the substance of what has to be the most important or one of the most important legislative functions. The lower court didn't make that distinction. Indeed, while the lower court said – acknowledged that one of the set of questions to Mr. Bernard had to do with Ms. Tavenner, did not make reference to the fact that the context was in a confirmation process, which we say goes to the heart of the speech and debate process of protection of the Senator's prerogatives. Just so we're all clear about what we're addressing at this point, the only objections that are before us now are to the 50 questions that are in Exhibit 2 where the Senator has said either that there is an objection or has conceded only that Bernard might be able to answer them. That's correct. The government has put forward an appendix to your record on the appeal, which includes more than 15, Ron, is it? Fifteen. Fifteen. Five-zero. Right. And of those five-zero, there are many that we would concede could be answered had we had the opportunity to discuss that with the government prior to being here, but we couldn't do that. Since we are now focusing on those 50 questions, 5-0 questions, what do you want us to do? You indicated perhaps this case is here a bit prematurely. I believe it is. At least the record is premature. I believe it is. What do you want us to do at this stage? I think that, as we suggested, I'm sorry, in our briefs, what I think you should do, and I even argue after the case in the Governor of the Virgin Islands case, or even Judge Fischer, the procedure you used last fall in an attorney-client crime fraud exception is to allow a district court to make a proper record. And for the district court to make a proper record, it could do it in one of two ways. It could do it question-by-question of these 50, which we think it should have done, and we think it's error for the court to say that it did not review the record and it would not look at all the questions and it was too onerous for the court to do that, but we think there's two ways you could go. You could do it question-by-question, or you could do what we were starting to do with the Justice Department and create a series of topics and timing that would work equally well. For example, questions can be answered that go to logistics. Some of the questions of the 50, Judge Krause, is how long did the meeting last? Who was at the meeting? Where did it take place? I don't know why that's all relevant, but those questions are logistical. They can be answered. Versus those are in the content. What did the senator ask the nominee for a position of importance in the administration beyond the ability? So you could do question-by-question, or you could set out the framework. Another framework, Judge Fischer, would be temporal. For example, the meeting with Administrator Tavenner was set up for the purposes of a confirmation. That was at a certain date and time. So the activity around that. At least that's what the scheduling log says. That's what the scheduling log says. Then how can you, sitting on appeal, know whether to either agree or disagree? Is there anything in the record that contradict that? I don't think the record would contradict that. Is there anything in the record that would contradict that? No, I think that even the government would concede that there came a point that Senator Menendez met with Administrator Tavenner over the fact of her being nominated and him having to consider. Well, they would concede that, I'm sure. They're not saying I don't. I mean, they do say, you know, we're not sure this is all part of the nomination process. They put that in question. But there's something besides meeting with her to vet her as a candidate, or at least arguably there is, when you have communications beforehand with Mr. Reed, the lawyer for the doctor, when you have communications after the fact that reflect upon a case, quote, unquote, that seem to imply this isn't about vetting a candidate on some broad policy issue. This is about lobbying or influencing an acting administrator, not in a role as a nominee, but as the acting administrator of the agency. I mean, those are things in the record from which a judge, a reasonable district judge like Judge Thompson, could conclude, wait, there is something here that is beyond legislative act, and they're entitled to inquire into it. So that's, I guess, a very long prelude to one say, I'm not sure you're right when you say there's nothing. But more to the point in the way of a question, is there at least a decent argument that she did make a fact finding? She had a record, and in saying answer it, she was implicitly saying, I'm relying on these other things in the record to say I think this is beyond a legislative act. Let me answer both parts of your question. To the second part first, I don't know that this court can imply, or I guess you'd have to infer that there was some fact finding record review that was done to lead to a conclusion that all 50 questions, without regard to whether they were in the context of the purest speech and debate activity, was reviewed by the district court. But what we do know is what the district court said. And what the district court said on the record is, I am not reviewing each question, I'm not expected to look at each question, and I'm not going to look at all the material submitted. Now, that's what she said. She said that in the context of trying to get you guys to narrow it. One thing appears to be clear is that Judge Thompson was struggling mightily to get the two sides to get together and talk about what they wanted and meet and confer and come up with some defined set of problems for her to address. And that, in effect, she was saying, I don't want to hear the dump truck back up and you put 1,000 pages on my desk and then tell me, hey, this is like Wagyu, Your Honor. Our speech and debate defense is in there somewhere. But that's not what we did and tried to do. And, again, to answer the second part of your question, there is that moment where you can characterize an inquiry made by a staff person for a senator to an individual or his or her lawyer about how something is going in a case that can be interpreted as being case specific or it is about a policy of which that case is represented. One of them, depending on how you carve the salami, if you want to use that expression, might be in the casework side of the McDade continuum. The other would not be. Look at McDade as an example, but I want to say as to Tavenner, that goes to what we believe in the Virgin Islands case is that type of legislative activity that's so to the core of legislative activity that you don't have to parse it out. Assuming that the discussions were all about the nomination, but that's an assumption, right? I mean, she was the acting administrator. She had two hats. She was a nominee, but she was acting in the position to which she was nominated. The meeting about which Mr. Bernard was asked questions, Judge, is a meeting that is framed as and the testimony is for determining the senator's view of her confirmation process as that. Now, was there a call before that happened? I would tell you that if there was a call a month, two weeks, three weeks, four weeks prior to a meeting about confirmation in which she's wearing her hat as the acting, then you could make the argument that it was for the casework, let's say. But once it became clear that he was using his position to decide whether to advise and consent, it became the kind of legislative activity that goes to the core. Even though it was briefed the day before by the doctors lobbyists. See, it doesn't matter. See, that's where it doesn't matter. A senator or a congressperson, but here a senator in advising consent, can gather information protected by the speech and debate clause from any number of sources. It could be from a private person. It could be from a staff member. It could be from a newspaper. And if you inquire of the senator, did you rely on that? Did you use it? Was it important to you? You're violating the speech and debate clause. But the Supreme Court's jurisprudence clearly says we have to evaluate all these speech and debate clause claims of privilege on a case-by-case basis. That's true. And I think the cases that talk about the broad frame. Not a question-by-question basis, but a case-by-case basis. But you also have the case law in this circuit especially, which talks about evaluating questions of privilege on a question-by-question basis. Look what happened in the. . . That's not necessarily so. If the nature of the conversation is not protected, then any range of questions would be appropriate. The question is whether the communication itself is covered. And here Lee teaches us that we don't take at face value the representation that this was a meeting to discuss, to vet for confirmation purposes just because that's on the calendar. It says you do further inquiry beyond that. And isn't that exactly what we have here? Because we've got a finding by the district court that those meetings and communications with Pavaner were for the center to assist him in resolving Dr. Milgan's Medicare billing dispute. I don't think that the district court. . . I'm sorry. I know I'm out of time, and I want to answer your question, so I didn't hear it at the end. I think we have time for one more question. I think the clock is going to be off camera. Mr. Lowell, what we're going to do is, Marina, we're going to give Mr. Lowell an additional ten minutes. Now we're going to keep you to that additional ten minutes. Judge, I'm happy to be kept at his ten minutes as I see them being put on the clock. I heard the first part of your question just now. We have a finding. We have a finding on the one hand. And then we have a record that the district court. . . We presume the district court was aware of the record that was before that court. And that includes not only the prep with the doctor's attorney two days earlier, but O'Brien's June 29th email that suggests that Ryder had actually prepared the points, the talking points for even that first meeting. And then we've got the summary that Bernard prepared that talks about how the changes to current policy wouldn't have, quote, any bearing on the issues at hand since we're looking at payments in 2007 and 2008. And we have notes of what was discussed in the meeting with Padner. So looking at those and seeing as they relate to what Bernard's memo itself describes as the issues at hand, that is payments in 2007 and 2008, how could it be clear error for the district court to find that this communication was an unprotected one, that it was in the nature of case law? Well, I used the expression clear error, and I don't know that that's the standard of review to begin with. I think you're looking at these as if de novo. But putting that aside, I want to suggest to you that your question presumes that even if, in the box that we would call a meeting over the confirmation process, all Senator Menendez had in his hands was material provided by a private person or his or her attorney, asking the Senator what you did and discussed and thought about and considered and asked the nominee about is at the heart of the advise and consent part of a Senator's responsibilities and is core to the speech and debate clause. In the box of that meeting, what we know about that meeting is from at least that's one of the problems. The district court did not spend any time. Indeed, the district court's opinion doesn't even state that the tavern meeting was about a nomination that was pending in his review of it. It doesn't even make mention of the very thing you're mentioning, which is the memorandum or notes that indicates the calendar entry that says for confirmation. So how do you know that? How did she have done that? I mean, you seem to be taking dual positions here, and I hope I'm mistaken and that you can help me straighten this out. On the one hand, you seem to be saying in answer to Judge Krause's question, there's a box and the box is vetting a nominee, and as long as we're inside that box, you can't do anything. Then on the other hand, you seem to be saying the district judge didn't do enough in the way of fact-finding and making a record. If we really can't get inside the box at all, shouldn't your position be, it doesn't make any difference what was said in that meeting, nobody can ever inquire about it, and then fact-finding is irrelevant. But if that's your position, don't you run headlong into Lee, just as Judge Krause has indicated, because Lee tells us we don't have to take what the scheduler puts on the calendar as sacrosanct. If all the evidence around it implies that despite it saying vetting nominee, what was really going on in that room was you give this guy back his $8.9 million, dang it, then that's something that's not a legislative act, and the label doesn't change it. Okay, so to answer the three parts, if I have them right, first, I don't think what I'm saying is contradictory, because the district court didn't even acknowledge that we're in the box. So the first thing the district court should have done was acknowledge that we are at least in a confirmation process. Whether or not she then decides that the questions were pertinent to it or outside of it, there's no indication that the box exists in the district court's opinion first. Second of all, I am saying that if you're in the box, then inquiring as to a senator's actions in the box, we believe goes to the part of the governor of the Virgin Islands case, which says there are some acts that are so legislative in nature. Haven't you just put the rabbit in the hat when you say there are some acts? Well, saying there are some acts assumes what happened in that room. You're assuming and asking us to assume that the label that's hung on it reflects the reality. Now, I misunderstood, so let me try it from a different angle. If a senator is vetting a nominee for some position in the advise and consent aspect of that senator's job, and in doing that says to them, what do you think about multidosing? Okay. What do you think about multidosing? And, by the way, I understand the issue of multidosing because I have this friend named Dr. Melvin who's got a multidosing dispute worth $9 million to him. But you know what? I think the policy is very strange and counterproductive. Those are not different. The fact that you might use an individual's case or facts or even saying I think you're wrong in policy and a good example is the way you are using it in this case still makes it in the box. And I think what Judge Krause was asking is if you have questions that seem to be about an individual case, can it be consistent or inconsistent with the kind of legislative action that is protected under the speech and debate clause? And in that context, I think you don't make those distinctions. You asked me about the Lee case, the governor case. Remember what it said was in addition to the requirement for fact-finding, which we think is not sufficient, it also said that what you're trying to look for is to see whether or not the information is obtaining information, quote, pertinent to a potential legislative activity. And I realize that that's a vague phrase, but if you think about confirmation process, how could not asking questions about an individual case? Maybe one of the problems I'm having is members of Congress don't learn about events because they wake up knowing about them. They learn about them through the cases of individuals. Nobody is suggesting otherwise. I think both sides would agree, or I'd be surprised if they didn't, that on the McDade spectrum, we're not over here in pure legislative acts. I don't know, maybe you're going to take the position that talking to Tavner was pure legislative. That seems to be what you're taking, but that's a little surprising to me. I thought everybody was going to be agreed that we're really in the middle someplace. There's evidence here from which a rational person like Judge Thompson could look and say, you know what, we're not in the well of the Senate making a speech, and we're not clearly over here and obviously lobbying, we're someplace in this murky middle. And so as in McDade where the letter to the Navy Secretary was out and out lobbying and the letter to the Secretary of the Army was, I don't know, we're maybe in the, I don't know. I don't know how that's going to show up on a transcript. We're just not sure. And if we're in that not sure place, if that's where we are, then there arguably has to be some clear fact-finding, but you wouldn't take the position that fact-finding is irrelevant because the scheduling book says vetting candidates. All right, so can I back into that? Let's start. The easiest way to answer your question is, first of all, I think the easiest application of the McDade spectrum is in the questions that the government wants about Secretary Sebelius' meeting, which could be pure oversight and it could be not. That's the one in which Majority Leader Reid is also involved in. And I believe the McDade case is a perfect example of that because you have in that case two letters, both of which the goal is exactly the same. And to the extent that this court talked about it, it said letter one, which talks about an individual, talks about the individual facts, asks it to be resolved, is not protected. Letter two, which doesn't mention the name of the individual, doesn't have that kind of individual aspect of it, is in that, to use your expression, the eek, I'm not sure, grounds. We didn't hold that. It suggested that it might be and didn't need to reach the question. Yes, I understand that in that context it wasn't, but it's the best jurisprudence we have, and it's sort of ironic and wonderful that it's in the circuit because if you look around the country, that acknowledgment of spectrum and on one side case, the other side legislative, and the need when you combine it with the Virgin Islands case for fact-finding is why I think the fact-finding was needed, as you were suggesting. As to the tabular meeting, it's one of two ways. I would be prepared to say that even in the spectrum issue of McDade, the fact-finding would indicate that we're in that middle ground and more is needed if you apply it. Mr. Long, I think I understand what you're saying, and there is this murky middle, this gray area, and whether it be oversight or legislative fact-finding. But my question at this stage is taking what Judge Thompson did and what Judge Thompson wrote, and perhaps Judge Thompson's writing was a little more brief than what a reading of the Virgin Islands versus Bell would lead one to conclude had to be written. But understanding what Judge Thompson did, what do you say she should have done with respect to the 50 questions and particularly those parts of the 50 questions that relate to the Taverna discussion? What should she have done? I think there's two ways to do it. First of all, Judge Fischer, just again, in just the last few months, you approved a district court doing an in-camera question-by-question analysis in an attorney-client privilege crime fraud case. I would posit to you the speech and debate privilege is at least as important. So you could have gone that route. You could have put Barnard in the room with her. You could have asked the questions. You could have found out the answers. You could have then decided whether or not, as you did or at least as you wrote the opinion affirming, it did or did not fit within the privilege or the exception to the privilege. That would have been an okay way to go. I still think it's an okay way to go. Then didn't you just submit to the interview, which would have achieved exactly the same result that the government sought to have? Well, but it didn't work that way, Judge Krause. We did submit to the interview. We gave them Ms. Talbert, who was there for an hour and answered 400 questions. I'm sorry? Not that far. Oh, because Judge Thompson said, if you look at her original order, yes, you can try to work it out, have interviews, and, if necessary, come back to the grand jury to put your questions on the record for review. She didn't say answer all the questions and then have every question re-asked in the grand jury, especially those that are going to be answered. Well, there has to be a record, right? I meant, well, you had to know that they weren't going to be satisfied just with an interview. That's not true. I mean, I was shocked, actually, as somebody who's done this for two and a half decades, that having had every question answered with four or five FBI agents writing notes, they didn't say, by the way, we want to re-ask them in the grand jury. That they wouldn't want it on a transcript under oath. Why wouldn't they? How many times do you know that cases are probable cause without having people in a grand jury? Happens all the time. I thought the point of the grand jury in this context was to identify those questions that needed to be reviewed by a court and or a court of appeals, not to repeat those decisions. Mr. Lowe, we're going to have you back with your rights on. I see. That's right. I appreciate that. You're in the government and you reserve four minutes. Mr. Kosky? Good afternoon, and please report. Peter Kosky on behalf of the United States. The record supports the district court's finding that the 50 questions presented to Mr. Bernard in the grand jury touch upon topics that are unprotected by the speech and debate clause. Let me ask you a question. Those 50 questions, I can't hold them up, but they're on my iPad. They're right in front of me. Those 50 questions, was Judge Thompson ever given those 50 questions? Yes, Your Honor. Judge Thompson was given those 50 questions at least one week before she issued her November 25th order, granting the government's motion to compel Mr. Bernard. Who gave her those 50 questions? The government did. My colleague, Ms. Abishami, and I. On that document that Judge Thompson had, did it indicate in that document which question there were objections to? What we provided Judge Thompson was the entire transcript of Mr. Bernard's testimony, and this is specifically what she asked for so that she could do precisely what the appellant is asking for now, which is a question-by-question analysis. She never had the transcript, did she, of Mr. Bernard's testimony? She did. She received the transcript on November 19th, and she issued her order granting the government's motion to compel on November 25th. What she never says in her, part of maybe my difficulty in looking at this, is I don't see anywhere in her opinion that she said she had 50 questions or that she looked at the transcript. She does, Your Honor, on page 3. She makes reference. She makes reference specifically. So you're saying that the reference that she makes is to those same questions. That's right. Specifically, she says, beginning on page 2 at the bottom, the court finds that the questions posed by the United States to Mr. Bernard and Ms. Talbot before the grand jury on November 12th, the statements given by Ms. Talbot on October 31st, that they are unprotected by, specifically that they fall outside the speech or debate clauses. Okay. And I had this question, and I couldn't answer it last night. Before the grand, the statements given by Ms. Talbot on October 31st, which are summarized in Exhibit 2, the United States Report on Compliance, that Exhibit 2 includes also the questions given to Michael Bernard. No. Exhibit 2 is just the FBI 302 summarizing Ms. Talbot's statements made on October 31st. All right. But that doesn't refer to Bernard, does it? No, it doesn't. So where in the questions posed by the United States to Ms. Bernard, Ms. Talbot before the grand jury? The statements given? You're saying from that very brief statement, you're saying that if you compare the record, Judge Thompson had the questions and had Bernard's testimony before the grand jury, and even though brief, she compared them. That's right. On November 14th, the government provided the district court with the grand jury transcripts of Ms. Talbot and Mr. Kelly as well as the FBI 302 summarizing Ms. Talbot's statement. I'm not being redundant in my questioning, but is that in the record? Is there somewhere in the record that you can point to that we can look at to confirm that that's what happened? Certainly. To begin with, it is in the government's report in compliance with the court's October 27th order. I don't have the precise page number of the appendix off the top of my head, but specifically on November 14th the government filed its report in compliance with the court's October 27th order, and in that report the government notified the court that it was providing concurrent with that report copies of Talbot's transcript, Kelly's transcript, and Talbot's 302. Do the appellants have Talbot's transcript? They have. The appellants were given redacted portions of Kelly's, Talbot's, and Bernard's transcripts. So let me ask this, which I asked Ms. Shule right at the get-go. Are we down to Bernard here? Is the government agreeing Talbot's off the table, Kelly's off the table? We're only talking about Bernard at this point. Based on the representations that were made by the appellants in his opening and reply brief, we should be down only to the 50 questions presented to Mr. Bernard. Don't tell me you should. Are we? The reason I equivocate is because the appellant is stating that there may still be a use privilege regarding the documents at issue, and there should be no dispute that for purposes of a speech or debate clause, the grand jury is any other place. So when the government publishes those e-mails to the grand jury, the government is using those e-mails in any other place. And so if Senator Menendez is going to assert his use privilege over these documents, he needs to be clear about that. Ms. Talbot may not be able to do that, but Senator Menendez certainly can. So the e-mail chain, we're talking about a single e-mail chain plus Bernard's testimony, the 50 questions is what's before us today? Yes, it doesn't get beyond that. And I agree that the 50 questions, I mean, other than maybe some clarification Senator Menendez can provide as to whether or not he is asserting the use privilege over the e-mail chain before the grand jury, which is any other place for purposes of a speech or debate clause, the 50 questions are where we need to focus. If that's true, then my question is, why are we here? You know, your assertion that this is largely moot, and Mr. Rohl's statement that I think a lot of this stuff is premature, I'm wondering, yeah, call it moot, call it unright, but why are we here? Why aren't you folks back in front of Judge Thompson saying, please reconsider. Here are the 50 questions. We're agreed that it's come down to this. Can you help us with these problems? In short, coming back to what Judge Fischer asked right at the jump, what do you want from us? What I want is for this court to affirm the district court's order and to do so as soon as possible. But getting back to why we're here, Lindsay is very instructive. Hold on just a second. If you guys have agreed that a bunch of this stuff is moot, we shouldn't be affirming it, should we? We shouldn't be talking about stuff that's really not in contention. Should we just be sending you guys on your way and saying, it sounds to us like there's really nothing for us to do right now, go back to Judge Thompson, show her the 50 questions that you've agreed are now what's in play, and work it out with her and come back to us with a better factual record if and when you run into a problem. Isn't that what we should be doing? Well, I think Judge Jordan and Judge Thompson did that when she was given a transcript on November 19th of Mr. Bernard's testimony. She did. She had the entire transcript of Mr. Bernard's grand jury testimony on November 19th, which was a week before she issued her order. When you say she had the entire transcript, did anybody hand to her a document that had 50 questions listed on it and said, Judge, this is all we've got left, this is what we're fighting about, and help us sort through where we think we've got speech and debate issues, and then put on in front of her evidence from which she could make a judgment about, okay, this looks like it's on the clearly legislative end of the McDade spectrum, this looks like it's in the middle, this looks like it's clearly over here, influencing the executive casework side. Did anybody go through that exercise with her with 50 questions on a piece of paper? We did not provide to the district court the 50 questions as we provided to this court. Well, I asked you that initially. You said that she had the 50 questions and she had his testimony. She did. She absolutely had the 50 questions. No, you just said she did his testimony. You didn't. Well, it's a different question. She did not have them in the same form that they were presented to this court. She had the transcript. Correct. She had the entire transcript of Mr. Bernard's grand jury testimony, which contained each of his assertions of the speech and debate clause. It's the government's position that in her order to compel, when she's ordering Bernard to reappear before the grand jury and to answer the questions posed on November 12th and provide the testimony previously withheld, that that order is as to the 50 questions that were previously withheld. Correct. The answers were not provided. Correct. And, Judge Jordan, with respect to your question about, you know, did we provide the district court with the material or exhibits that the district court could look at to determine whether or not something fell in the manifestly non-legislative act or whether it was in this middle ground between the two poles of manifestly legislative and manifestly non-legislative, the government did that. One of the exhibits the government provided the district court with was Mr. Bernard's transcript of his grand jury testimony, his November 12th grand jury testimony, because a lot of the statements that he did make during the course of his testimony, which there was not an assertion, were statements and evidence the district court should consider in determining where on the spectrum that meeting and those statements fell. What should we do with McDade, Eilberg, Lee? In each of those cases, our court said, in effect, look, the district court should have some kind of a record developed on the basis of which a judgment can be made about whether this falls within the protection of the speech and debate clause. And, Lee, it was sent back. I mean, this was remanding for fact-finding because there wasn't enough before. Isn't the message we're getting from our own precedent repeatedly that this is a fact-specific inquiry and a sort of a generalized statement that, eh, it all looks like it's not covered to me, isn't good enough? No, the district court here did exactly what this court ordered in the Lee case and in the McDade case. Specifically, in the Lee case, to follow up on something Judge Kyle said earlier, this court stood by the principle that it should not merely, a district court should not merely take a purported representation or an apparent representation that conduct was protected legislative activity. Sure, but I'm looking at the whole, and I don't want anything I say here to be taken even implicitly as finding fault with Judge Thompson. I think she was wrestling with mush. You guys were both given her mush, frankly. You know, she was trying to get you to come down to some firm ground on which she could rule. And when she does rule, the justification for her ruling amounts to literally two sentences, two sentences, in which she says Senator Menendez's meetings, et cetera, in resolving Medicare billing dispute and preparatory meetings with representatives of Dr. Melgen, in advance of those meetings and contacts with branch, executive branch officials, are unprotected. That's a conclusion. And then she's got one more statement of conclusion. Can you point me to where in her ruling there is something other than a conclusion? In your briefing, you talk about it as impliedly finding, which I take to be a concession that we're not going to find an explicit finding in here, are we? No, I think the government was accurate when we described it as an implicit finding. But I think when you look at the record below and the exhibits provided to the district court, two sentences is really all that's required here. Judge Krause pointed out the June 29th Daniel Bryan email. You know, I think the most compelling exhibit in the record is found at page 252 of the appendix, and this is the April 2012 email from Michael Bernard to Daniel Bryan, which says, and this is in advance, shortly in advance of the Maryland Taverner meeting, can you circle back with Dr. Melgen's attorney to find out specifically what they're asking for? I just heard from Senator Reed's office who needs to know because CMS is asking. I know they've changed from their original ask, so we need to know what they're seeking now. You're right. Maybe that's great evidence, but shouldn't she be saying that? Isn't that a fact finding that she should make and not one that we should assume she made? Isn't that what McDade and Eilberg and Lee are all telling us? Is the district court supposed to make those findings a fact? I don't think McDade, Eilberg, or Lee compelled the district court to do anything different than what the district court did in this case, which is consider the record. There's certainly no evidence that the district court did not consider the record before it. Well, I mean, I think the record's at least a bit unclear as to what Judge Thompson considered. I don't think it is. I know the appellant has made that argument that the district court. We can already look here at the opinion. I don't know what else is in the record. There was no hearing. And there was the testimony before the grand jury. And there were a number of exhibits. In support of the government's motion to compel, the government provided the district court with 74 exhibits. I believe in response, the appellant provided the district court with 27 exhibits, and then the government provided the district court with a number of additional exhibits that accompanied its report in compliance, including the grand jury testimony of Michael Bernard from his November 12th appearance before the grand jury. I'd like to ask you to focus on a slightly different issue, which is. . . Can you please put an additional ten minutes on the government's clock? Thank you. Which is, what evidence is appropriate for either the district court, or if this comes back to us, for our court to consider when we're evaluating a communication that falls somewhere in that middle ground? And let me just frame the question in the sense that there seems to be plenty in the exhibits that you put forward that are in the record that go to motive and purpose. But we also have cases like Johnson that say we should steer clear of motive and purpose, so that we can look at the content of the communication to determine whether it is in the realm of a protective legislative act or not. Here, without an ex parte hearing regarding what it is Bernard would say, what was actually said in the course of those communications with both Tavener and Sebelius, how can the district court, or could we, make a determination about whether this is in the legislative act realm or not? We don't even know, for example, the answer to the question whether the doctor's appeal was raised in the Tavener conversation. And isn't the most critical distinguishing fact as to which end of the spectrum this is going to come to, whether the request was to assist in his appeal, or the request was, I'd like you to consider a regulatory change, or I'd like to know these facts about your policy as I'm contemplating legislative change. But when we don't know what that ask is, because that part of the record hasn't been developed, how can we make the determination? So I guess there are a few questions in there, but an important one is, does motive even come into play? And those exhibits that you put into the record, they may inform the question why the senator set up the meeting, but if the content of the meeting is legislative, how is that any different than an individual constituent going to a representative who then makes a speech on the floor motivated purely by that individual case? The difference is that a speech on the floor of the Senate is a manifestly legislative act, whereas a meeting with an executive branch official is not. So that line of cases like Johnson and Judge Krause that you're describing, which say that motive or purpose is something that we cannot look at, that is solely for the purposes of motive for a manifestly legislative act. So in the case of Johnson, if Senator Johnson made a speech on the floor of the Senate in exchange for a bribe, well, that speech on the floor of the Senate is a manifestly legislative act and a corrupt purpose for performing that manifestly legislative act. It's not something that can turn that speech into an unlegislative act. It retains its immutable quality. But with respect to conduct that falls in that middle ground between manifestly legislative and non-manifestly legislative conduct, there needs to be some inquiry into the purpose of the meeting, into, for example, in the meeting with Tavenner, into the consideration of the fact that the day before Senator Menendez's meeting with Marilyn Tavenner, he met with Dr. Melvin's lobbyist and lawyer, Alan Ryder. The fact that just weeks before that meeting there was an e-mail from Michael Bernard to Daniel Bryan asking Daniel Bryan if he could reach out to Alan Ryder to find out what Dr. Melvin's specific ask is. Let's assume for purposes of argument that the subjective purpose, the motivation, is to assist an individual donor or constituent. But if the meeting that then follows is one where a member of a committee that has oversight of this agency discusses only the policy or discusses the potential for regulatory change, why would we look beyond the content of the conversation and go back to say, well, I'd like to know, that's all well and good, but if the subjective motivation was an illicit one, was individually motivated, then that's going to take it out from being a legislative act. And that goes to really the heart of the protection that the clause was supposed to provide. Shouldn't we try not to go there but to just focus on content? I think it's most helpful to compare the record and the exodus that we've been describing with the narrow nature of the questions and limited scope of the 50 questions that were presented to Mr. Bernard. So the government didn't ask Mr. Bernard and the grand jury, tell us everything that was discussed during the meeting or tell us everything Senator Menendez said during the meeting. The questions were very limited in scope and nature and focused on Dr. Melvin's Medicare billing dispute. That's where Alford comes into play because that case says that even with something as innocuous as toll record information, it's still protected if it reflects a legislative act. So don't we need to make the threshold determination whether this was a legislative act? And while there's evidence of motive, we don't have evidence of the basic content of at least the Taverner conversations, right? We also have motive and purpose with respect to the Sebelius meeting. For example, in pages 407 and 408 of the appendix, we have the e-mail between Daniel O'Brien and Senator Menendez on their personal e-mail accounts where Daniel O'Brien is asking Senator Menendez if he had informed Dr. Melvin yet of their plan to schedule a meeting with Kathleen Sebelius. Senator Menendez responds that he has not yet done so because he doesn't want to raise Dr. Melvin's expectations in case the meeting falls through and so he wants to wait until the meeting is confirmed before he notifies Dr. Melvin. That goes to subjective motive, but if we look at content on Sebelius, then you have the appendix at 1047-8 seems to reflect, and correct me if you have a different understanding of it, Secretary Sebelius in those notes saying, no authority appeals board has the case by law and regulation can't intervene. Absolutely, and that supports my argument that the purpose of the meeting with Kathleen Sebelius was Dr. Melvin's Medicare billing dispute, and what she's describing there is Dr. Melvin's appellate process going through the administrative law judge and the Medicare appeals council, not talking about anything that would be protected legislative activity. I mean, that exhibit that you just directed us to helps to establish that Senator Menendez's meeting with Kathleen Sebelius was not protected legislative activity. It was instead a political errand. But how about Kavner? What do we have that shows us that anything in the content of Kavner's conversation even raised the issue of the doctor's appeal? We have the fact in the record that Senator Menendez in his office met with Dr. Melvin's lawyer and lobbyist. That's missing the point. What about the content of the conversation? I mean, I guess I understand maybe you're saying we should infer, because they met, that the conversation was bad. But do you have any at this juncture you've got no direct evidence, nothing like what you just described in your back and forth with Judge Krause about the meeting with HHS Secretary Sebelius. Is that right? Correct. We have no transcript of either meeting with Sebelius or Kavner. But it certainly can't be the rule that if we don't know what was said during the meeting, we can't probe into what was discussed during the meeting. Let's suppose, here's my problem with the position you seem to be articulating and the way you'd like us to interpret the decision of the district court. I hear you saying, well, there was an improper motive here. This was all being done to help Dr. Melvin because Dr. Melvin had done certain things for Senator Menendez. Isn't that partially what you're saying? Let me take all that out. Senator Menendez happens to be down in Florida, has an eye problem. He's over 65. He goes to find an ophthalmologist. It happens to be Dr. Melvin. He gets treated with his drug, Lucentis, and the doctor tells him, you know, I'd be able to submit this for reimbursement, but the solvent that I'm using was some leftover solvent from somebody else who just came in yesterday, and therefore I can't get reimbursed for your treatment, but, you know, don't worry about it. And he said, really? I can't believe it. I heard about doctors not getting reimbursed. I'm going to do something about this. No other contact, no trips, no plane rides, no contributions, nothing. He gets engaged, goes essentially through the same steps that have taken place here. I think you'd have to agree with me. You can't prove any improper motive from the facts I just described. Would all of these questions be unprotected by the speech and debate class? I see that my time is running out. Don't worry about the time. We're in charge of the time. Thank you. Thank you. Good question. So let me just clarify that whether or not Senator Menendez's meetings with Kavanaugh and Sebelius are protected by the speech and debate clause does not turn on whether he had a proper or improper motive or a corrupt or benign motive. No, but I ask you, weren't you ascribing the motive to the breadth of what Judge Thompson found as to the extent to which Senator Menendez was trying to influence the executive branch? Sort of. The government's position is that whether Senator Menendez was corruptly influenced or not corruptly influenced, his meetings with Kavanaugh and Sebelius are still unprotected acts, and that's because he is seeking to influence executive agencies with regard to Dr. Melvin's $8.9 million Medicare dispute. He concluded from that simple visit to an eye doctor that that was wrong. Verner's a nominee to be a permanent head of CMS. Sebelius is the secretary, and he's the United States Senator, sits on the Senate Finance Committee that has HHS under his jurisdiction. What's wrong with that? Why isn't that the kind of legislative oversight that cases have talked about? Sure. Well, legislative oversight has been defined very narrowly. If the legislative oversight included, for example, Senator Menendez holding a hearing on the Finance Committee regarding this particular issue, call Marilyn Tavenner to testify and ask her questions about this, that would be protected legislative activity. That is protected legislative oversight. But if Senator Menendez is instead going to Marilyn Tavenner and then escalating this issue up to Captain Sebelius, specifically requesting that they allow Dr. Melvin to keep his $8.9 million, well, that moves away from protected legislative oversight. What's left of the testimonial privilege? Because what it sounds like you're saying is if they're pressing for one specific thing, lobbying for it, then it's not covered. And if they're more broadly based policy issues, then it is covered, and that seems to be supported by McDade. But what is the good of the testimonial privilege if, in order for the government, the executive branch to decide that question, whether it's satisfied with it or not, it gets to cross-examine the senators and the representatives and their staff about what exactly was going on in any given meeting? The government is not conceding that if Senator Menendez omits Dr. Melvin's name from these meetings and instead advocates on behalf of a particular policy that is going to benefit Dr. Melvin, that that somehow transitions the conduct or the statements from unprotected activity into protected legislative activity. Hold on. Let me make sure I got that. Are you suggesting that any time a U.S. senator or U.S. representative takes an action which might benefit somebody, that that fact that it might benefit somebody takes it, removes it from the protection of the Speech and Debate Clause? Absolutely not. No, the inverse. What I'm saying is that maybe I misinterpreted your question, Judge Dorgan. Let's get real specific, and what my colleagues will indulge me. I'll just take an example or two from the transcript, the redacted transcript, which were given to us. And I'll want to ask Mr. Orr the same question. Here's a question. Did Senator Menendez, this is on page A1228 of the appendix, did Senator Menendez ask Marilyn Tavenner to get back to him regarding this Medicare billing dispute that's covered by the Speech and Debate Clause? Okay, so that I understand is a question that's still challenged. It's not one of those ones that resolve. It's one of the ones that they continue to say is covered by the Speech and Debate Clause. Maybe I got that wrong, but I think that's right. If that's true that it's still challenged, why don't you articulate for us why you think that statement, that question, is not one that would properly be covered by the Speech and Debate Clause? It's not protected by the Speech and Debate Clause because it's an effort by Senator Menendez to influence the executive branch. No, you're assuming the conclusion, right? You're assuming that the answer to that question is, yes, he did say that, and, yes, we were trying to influence. But the question itself is, did Senator Menendez ask Marilyn Tavenner to get back to him regarding this Medicare billing dispute? And my question is, in essence, why isn't that covered by the privilege, the testimonial privilege associated with the Speech and Debate Clause? Well, if it's unprotected activity, then there is no testimonial privilege that would apply to preclude Michael Bernard from answering that question. The answer to that question is either yes or no. If it's no, it doesn't implicate the clause. If it's yes, it also doesn't implicate the clause because it's in reference to that Medicare dispute, Dr. Melvin's Medicare dispute, which is in the context of Senator Menendez trying to influence the executive branch, Marilyn Tavenner, regarding Dr. Melvin's $8.9 million dispute. So it's the specificity of the question about getting back about the Medicare billing dispute that you think, that kind of specificity is what helps make that question one that's proper. Is that right? Yes. If the government had asked, tell us everything Senator Menendez said during that meeting, well, then I could see there may be some merit to the objection, because who knows if it's touching upon protected or unprotected activity. But that was my interpretation of Judge Thompson's statements during the October 23rd hearing, was that that was the precise narrowness that she was looking for, and that's why we put Michael Bernard back in the grand jury on November 12th to ask him those specific questions and then bring the issue back to Judge Thompson so that she could review the transcript, which she had for a week before she issued her warrant. I'm going to try to bring this to an end, but I'm going to give you an opportunity to help us out here. What if we don't agree with you on this, on all of these points that you've made? You know, what do we do? What do we do with this? It depends on what you disagree with. Well, let's suppose we don't agree with you that Judge Thompson thoroughly enough explained her evaluation of the questions to which the privilege was claimed. What do we do with this? If you disagree with me that the order that she issued was that it didn't sufficiently make factual findings, then I think even in that case. Mr. Lowe referred to the other in-ring grand jury case, which was an opinion I wrote about a year ago, that evaluated the district court's review of in-camera testimony. We reviewed the in-camera testimony of somebody who was claiming the attorney-client privilege. Sure. Is that an acceptable alternative to get this matter back on track and to get the process moving forward again, which you're entitled to have move forward in some fashion? Well, I don't think it's necessary when you look at the record. It's not necessary if we agree with you, but if we don't agree with you, I'm trying to ask you, how would you like to see this shaped? Sure, sure. If there's nothing I can say in the next ten seconds to dissuade you, then I suppose a remand to the district court asking for more specific factual findings regarding its reliance and the weight given to the exhibits that were provided to the district court in the record in the context of the speech and debate jurisprudence holding that efforts by members of Congress to influence the executive branch are unpredictable. And the original questions, right? Because the exchange you and I just had a minute ago seemed to turn on the specificity of the question pointing to the Medicare billing dispute. That is, the question tying the conversation to the Medicare billing dispute. Maybe I misunderstood you, but you seemed to think that was a relevant point and why it took it out of the speech and debate clause, right? Well, I think it's relevant with respect to all 50 questions, not just the one that you provided. I mean, I think all 50 questions are sufficiently narrow so that whatever the response is, whether it's affirmative or negative, it will not risk invading the speech and debate clause. Okay. Okay. Thank you, Mr. Koski. Thank you. Mr. Roll. Thank you, Your Honors. Let me start by answering Judge Jordan's question that he said you would be asking me, as well as Mr. Koski, in terms of that particular question. Senator Menendez asked Marilyn Tavenner to get back to him regarding the Medicaid billing dispute. The problem, Judge, is that you need to know whether the answer to that question, by the means that Judge Fischer has indicated, is the way it's phrased. Was it saying a policy discussion of multidosing? Was the question asked in such a narrow fashion that during the Tavenner meeting it was, did he ask you to get back and explain again why you're not giving Dr. Milgren his $9 million? And that's the problem. You end up trying to figure out ahead of time what the content is without knowing the content, and you put your finger right on the problem. I want to answer the lit thing. It is a problem. But why don't you help us figure a way out of the problem, because it doesn't seem to me enough of an answer to say, and therefore you can never ask senators and representatives what goes on behind closed doors, because then it's too hard on the privilege. I think you could. Again, to use Judge Fischer's case, you could do it that way. You could get the court to ask the question, know the answer. Just as Judge – I forgot the lower court judge in the Enrique Grand Jury case, but had to hear the answers to decide whether the attorney-client privilege applied and a crime-fraud exception applied, knew the answers, and then made the decision. So your assertion is it's got to be ex parte. They've got to bring – I don't think it has to be, Judge Jordan. I think I've given some tools that I think Judge Thompson could use, and those, for example, are looking at the context of the timing and make a decision about it as to whether it's in my box or not in my box, but at least to make a decision as to whether it was surrounding the confirmation or not. Then she could make a decision as to whether if it's in the box it's covered or not. You could use timing. You could use whether it was information gathering versus asking right or afterwards, this is what was said at the meeting. There are a number of tools. So you're agreeing that if she looked at the record specific to, for example, a question like the one that we've been kicking around, if she looked at the record and she said, you know, there was the meeting with – and I called him Reid before. I apologize. Reiter. Yeah, Reiter. Reiter. Reiter. Reiter is – there was a meeting with Mr. Reiter the day before, a phone call. There was immediate contact with him telephonically or by email afterwards, and those appeared to be contacts teeing up questions and reporting back on questions, and based on that, it's clear to me that there was lobbying going on on there, so that's an okay question. You would agree then that a judge could look at the surrounding facts and the timing, et cetera, and say, go ahead, ask that in front of the grand jury, without having to have an ex parte here. The way you phrased the question, I think if there's enough indicia about which you could basically conclude that a question was divorced from the legislative activity, either in the McDade spectrum or, if you'll forgive me, the Virgin Islands case, which says some things are so legislative in activity that you don't have to improve further, then I think that's right, but I don't know whether it would be divorced. Let me summarize, because you've given us quite a lot of time, but I think you've asked a question that I'd like to answer. One is there was no time that the district court was given in a distinct fashion the 50 questions that were now in an appendix to this court and was given hundreds of pages, well, dozens and dozens of pages of transcript, without knowing what Senator Menendez's position was or how we might parse through them to answer one of your questions. Let me tell you what the district court's order does not include, that she had the specific questions, that she knew the senator's responses. Remember, we were not at the grand jury. We're not in the grand jury. We don't represent the individuals. We represented the office. It creates an inefficiency as to how many of those questions might have been answered. She did not indicate which of these questions were asked before the confirmation process, during the meeting, or after. She did not indicate which of these included the policy issues in the Sebelius meeting or not. Remember, Judge Crouch, you asked a question about the Sebelius meeting, but the record, if it was properly established, would have indicated that Melvin's name never came up by the senators, neither Majority Leader Reid nor Senator Menendez. It was Secretary Sebelius who raised the pendency of an appeal on the subject, and it was not the part of lobby. But you don't know that. Are you suggesting her statement by law and regulation can't intervene? Appeals Board has the case? That she's raising that spontaneously? No, no, no, not spontaneously. But, again, we could go. Not in relation to this particular appeal? Not, no. But I think you could say in the meeting, whether it was her or her staff members, the policy of multidosing, for example, came up because there was a live case. You could talk about the policy, and she still commented, and by the way, as to the live case, we can't do anything about it. One of the topics in the meeting was going to be prospectivity or retroactivity of a policy change. So it would have been natural for somebody to raise that issue. But, again, you don't know that because the record wasn't made at the district court to establish that Senator Menendez never raised the individual case of Dr. Melvin. That would be important in the McDade standard of letter one versus letter two. And as you pointed out, Judge Jordan, a legislative act doesn't lose its immunity because it can benefit an individual, even benefit an individual who brought it to the attention of the Senator, even if it's his friend, even if it's somebody who made a campaign contribution. The question is the activity. You're asking for a rule that sweeps very broadly the other way, that when someone, when a congressperson is lobbying for the benefit of a particular donor or constituent, if they couch the argument or even add to the individual appeal some policy language, that that is going to bring it under the offices of the speech or debate clause. Not exactly, but I would ask you to look at the concurring opinion of Judge Sirica in the McDade case, in which he said this doesn't mean that a clever member of Congress can't achieve the goals that that member wants for an individual. By doing it in a legislative factor for policy issues to benefit an individual, Judge Sirica said that's the risk the founders decided in creating such as an important element of the speech and debate clause. I don't think that's what we're doing here, but I want to point out that that is one of the things that was said in that opinion. I also want to say that the district court, Judge Krause, didn't respond to the following. You raised the Sebelius meeting. There were three things the record indicates were discussed with Sebelius. The Lucentis wasn't the only one. You had federal health center policy. You had the Lucentis issue. You had the Social Security 115. That was the nature of the policy discussions with the secretary of HHS. The district court makes no mention of it and assumes the whole point, or the government would want you to assume, the whole point was lobbying for a specific dispute of a specific person named Dr. Milgan. That's not what a proper record would show. How we recognized in Lee and the Supreme Court in Haseki that you can have a sort of mixed motive, if you will. You can have a communication where some parts are protected, others are not, and the right thing to do is not give blanket protection to the entire communication but to excise those in the United States. You could do that if that's what you would find on a proper record was a way to parse what happened in the room, but we're not at that point because your question to Mr. Koski also pointed out you've got to be careful in the speech and debate clause versus any other place when you start questioning the motivation of a member to say, act, legislate, inquire, oversight, and it gets dangerous when you start parsing it that way. But what we can say is that the record doesn't give this court the ability to decide those issues so to round it out to what you asked Mr. Koski at the end of the day, I think what we need is either some format, whether it's the use of the in-camera proceeding, whether it's the use of looking to see whether there's enough indicia in the record to allow a court to frame whether a particular question would have been in the McDade spectrum, whether I can convince the district court that once you're in the box, you're in the box, but you don't have that ability right now and neither do I. So we talk about implied inferences in a devoid record that under the Virgin Islands and under the in rejury case doesn't provide enough factual basis for there to be such an important decision as to whether the speech and debate clause has or has not been invaded, and that's why a remand is necessary. Can I ask a final logistics question? My recollection is that you had asked that argument be expedited in this case. The government asked? Is there time sensitivity in terms of our issuing opinion here? There's no statute of limitations issue, if that's what you mean, Your Honor, and if there was, we'd work that out. No, there is. I mean, I think there is a case that's been pending for a while. The government certainly wants to proceed. Senator Menendez has an interest for this not to be hanging. I thought there was something magical about an April date. There's nothing magical about an April 2015 date. There might have been another grand jury sitting, but we don't have an issue in terms of things like the statute of limitations, which normally would be the thing that you'd be worried about in considering any issue. So unless Mr. Plotkin says otherwise. With your permission, I can address that. There is a time sensitivity. The government provided some information in this, in its motion to expedite, and more specifically in the ex parte supplement to the motion to expedite, and so we greatly appreciate the expedited briefing schedule, the expedited argument schedule. There is and there remains some time sensitivity. Time sensitivity of what nature? I think that's probably answered more clearly in the supplemental ex parte, the ex parte supplement we provided with the motion to expedite. I thought that, without divulging what was in the ex parte material, are you disagreeing with Mr. Lowe that there is a statute of limitations, bro? Yes. All right. That's what I thought you were saying. As the old expression goes, I don't know what I don't know, and I object to not knowing that which might be true. We only knew what we thought we knew. Right. So there you go. We're all in limbo. So the last point, if I can make the last point. You already made your last point. Thank you, Ryan. And we thank counsel. We'll take the matter under advisement.